We'll call our first case of the afternoon, Penn Central. Good afternoon, your honors. May it please the court. My name is Michael Chiaffi. I represent the reorganized company, American Premier Underwriters, formerly known as the Penn Central Corporation, and the debtor, the Penn Central Transportation Company. I'd like to introduce my co-counsel at table, Nathaniel Jones and Carl Buchholz. Your honors, I'd like to reserve two minutes for rebuttal, please. Granted. The key facts here are very similar to another Third Circuit case, which is called In The Matter of the Reading Company, which Judge Roth wrote the opinion in 1997. Those key facts are really threefold, your honors. Number one, the reorganized company, APU, just like the Reading Company in that case, was given a fresh start by a consummation order that protected it from all pre-consummation debts and liabilities. Number two, the most significant feature of the consummation order was a sweeping permanent injunction, again, identical to the one in the Reading Company case, and indeed they were both virtually word for word the same in Section 7.02 of that case as well as this one. Where are you citing Reading Company in your brief? Your honor, I don't believe it's cited specifically in our brief. And one of the reasons it isn't cited is it really isn't as similar to the present case as you seem to think it is. And if it were similar, I think it would be in the brief. Here's a similar... It's not a bankruptcy case. I think to me the most significant issue in this case is Section 77N, and of course Reading doesn't deal with that at all. Right. Your honor, the reason I think it's similar is that in the Reading case, the court grappled with whether or not the claim was pre-consummation, and in this case there's no question that the claims involved are clearly, totally, without any dispute pre-consummation liabilities of the debtor. Well, but there's 77N wage working condition claims, and it's very tough for you to tell us the case is very much like another case we've never seen. That's the kind of thing that should be submitted in a supplemental brief or something of that kind. You know, the fact that I wrote it doesn't mean that it ought to be brought up now at the last minute at oral argument. Your honor, again, the other reason I cite it is because in that case there was a genuine dispute about the origin of the claims. Here there's not. And that's the reason I... No, there isn't a dispute. It's under their MPA claims. Early on, Judge Fulham recognized that these are the types of claims that really go through bankruptcy. The MPA claimants were paid $0.01. These people get $0.01 later on, present value. What's your theory? With respect to Section 77N, first of all, it doesn't speak to whether the reorganized company could be held liable for these obligations, these pre-consummation obligations of the debtor. There's nothing in Section 77N, and particularly the language, is a very narrow language which says no judge shall change the wages or working conditions. There's nothing about the issue of whether the reorganized company could be held liable that affects the wages or working conditions. And, in fact, we've never asked the reorganization court, we're not asking this court to change any wages or working conditions. Are you arguing, do I understand your argument to be that if we were a federal court, were to decide not to enforce the Ohio court's judgment here, that that would not constitute an alteration of the collective bargaining agreement? Absolutely not, Your Honor. How is not enforcing a judgment to provide benefits that were required by the agreement something other than a termination of the contract? Your Honor, what happened in this case is very typical of what happens when there's an intersection of labor issues and bankruptcy. And we cited a case to you called L.A. Cover Brothers. And in that case, like many other cases in this circuit and around the country, when there's an issue of a collective bargaining question, oftentimes that question is decided by arbitrators. And, in fact, this court said, quote, questions involving an interpretation of the Bankruptcy Act should be decided by the court, while questions involving the interpretation of a collective bargaining agreement should, if feasible, be decided by the arbitrator. And that's what happened here, albeit it took a long, long time. Well, it did take a long, long time, and you participated in it for a long, long time, never said, oh, the bankruptcy's over, everything's done, we're out of here. And now you come in and want, you know, an emergency, you know, as if all of a sudden you're realizing there might be some liability here. I mean, I just don't get why you sat on your rights, if you believe that. We didn't, Judge. Absolutely did not. I know that's what the district court said, but that's one of the errors that we've described to you in our briefs. Well, that's what the facts show. No, Your Honor, I'd like to direct your attention to Appendix 477 and Joint Appendix 478. These are two stipulations that the parties entered into in 1973 and 1975. In those stipulations, and let me read them to you, the claimants signed these. In fact, the current counsel signed them. And the court approved them. And the court approved them. And the last sentence said enforcement will be up to the court, correct? Well, it says more than that. It also says the stipulation, that is, the stipulation that the litigation of the labor claims can go forward in the Northern District, to answer Judge Smith's case. That fact would not operate as a waiver of any protection that would be extended to either the trustees or their successors, i.e., the reorganized company, by the bankruptcy court. So, Judge Rendell, we would strenuously suggest to this court that the fact that the district court ignored these stipulations is an error which requires reversal. Would you dispute that the argument you're making now could not have been made or could have been made immediately after finalization of the plan back in, when was it, 78? Couldn't you have raised the argument you're raising now at any point after around 1978? No, Your Honor. Well, I think the answer would be, is the answer we got from Judge Fulham in 2007 when we raised it. And that is, no, I said that these labor disputes would be resolved in the Northern District through arbitration, again, consistent with the Third Circuit's jurisprudence in COVR. Judge Fulham certainly was convinced that the bankruptcy would not affect the employees' claims, wasn't he? Well, there's that little snippet. It may be a little snippet, but it looks to be a pretty straightforward assessment of the situation by the one person on this universe who probably knew more about the Penn Central bankruptcy than anyone else. Judge, the reason he said that is that far from transcending the bankruptcy via Section 77N, what Judge Fulham clearly knew and what is set forth in his opinion adopting the consummation order beginning at page 75 of the record is that these labor claims were addressed head-on by the reorganization court, that the labor claims were an enormous issue and an enormous hindrance to the reorganization of the Penn Central. That's why in Judge Fulham's opinion, and, Cressa, you take a close look at it beginning on page 75, but what he describes is that this was not just a reorganization under Section 77 of the Bankruptcy Act, but it was also a reorganization pursuant to the Regional Rail Reorganization Act. And as we cite on page 62 of our briefs, Judge Fulham describes this in his order, is that there had to be a mechanism for paying these labor claims. And the reason that Skidmore excerpt doesn't matter and what Judge Fulham is really saying is, hey, whatever I decide here is not going to matter because under Section 211H of the Regional Rail Reorganization Act and under Section 504E of that act, those claims were being paid, and again the claimants can see this in their brief, already. That's why the 77N argument is unavailing because these claims were being addressed and they were being paid. Judge Fulham knew that. The claimants knew that. They admitted in their brief. And here's what's really important, that this mechanism was part of the reorganization. And Section 504E of the act says the following, quote, liability for employee claims and all claims by the employees arising under the collective bargaining agreements of the railroads and reorganization. Conrail shall assume responsibility for the processing of any such claims and payment of those which are sustained or settled on or subsequent to the date of conveyance shall be entitled to the direct reimbursement from the USRA. This was part of the reorganization. These labor claims were addressed and dealt with. Are you saying they were nothing more than unsecured claims? They were unsecured administrative claims. Like in every other bankruptcy. Unsecured administrative claims. That's internally inconsistent. Administrative claims are entitled to 100% payment. Right. Unsecured claims are not. Well, clearly. Why should administrative claims that are not paid for many years thereafter not get $100 present value, just like $100 claims during the proceeding? Because you have to decide this case under the Bankruptcy Act. And we cite to you a quartet of Supreme Court decisions which stand for the clear precedent, and it's Saper, Sexton, Vanston, Nicholas, for the clear precedent that under the Bankruptcy Act, interest that might be accruing on a claim stops at the moment of the petition, and there is no interest post-bankruptcy consummation. And it's clear from those decisions. The district court cites one exception, the Bruning case, which is limited by both this court in the Etna case and also the Supreme Court in Nicholas to its very peculiar facts, which involved an unpaid personal IRS claim in 1951. The debtor comes out of bankruptcy, has a refund due in 1953 and 1954, and the government wanted to accrue interest on the 51 claim, which was not dischargeable, of course, under Section 17. How do you get around 77N? What's your argument? Well, you know, I think 77N, what we respectfully request, that you remand this case back to the district court, find the reorganized companies not liable. I think Section 77N, for the reasons I said, doesn't apply because the labor claims didn't transcend the bankruptcy. What should happen, though, is a determination, which never happened at the district court, whether the claims can be asserted against the debtor. And there is a 1980 example, which is at page 206 and 207 of the record, of this happening in 1980. Is this your representative capacity argument? No. And, Your Honor, if I could address that for one minute. The dispositive language on the representative capacity is Section 602, and a very important error that the court made below is that it had a very truncated reading of Section 6.04. Essentially what the district court did is stop reading that section with the language, which may continue such litigation in the name of the reorganized company, and didn't consider the rest of that section, which is, or the respective reorganized secondary debtor. So the beginning of that section says the reorganized company shall step into the litigation. And this permissive section at the end isn't permissive vis-a-vis whether it may continue. Your Honor, may I finish answering the question? Yes. The permissive part isn't whether it may continue the litigation. The permissive part, i.e., the reorganized company, only has permission to make one decision. That is, continue such litigation in the name of the reorganized company or the respective reorganized secondary debtors. Our position is the reorganized company was compelled. It was ordered by a district court to do what it did in this case. And going back to your earlier question, Judge Rendell, it protected its interest in 1973 and 1975 with a stipulation, which said whatever we do in this litigation in the Northern District is not going to be a waiver of our rights under the bankruptcy. All right. We'll hear from you on rebuttal. Thank you. Thank you, Your Honor. Thank you, Your Honor. Good afternoon, Your Honors. My name is Fred Perillo. I have the pleasure of representing the 32 railroad employees in this case who won their arbitration case below. This case is a very straightforward contract arbitration under the Railway Labor Act. Because of the Pitney case, the order of railway conductors versus Pitney decided by the Supreme Court in 1946, primary jurisdiction over that labor arbitration was always in the system board of adjustment and never in the reorganization court. Doctrine of primary jurisdiction. Can you pull the microphone a little bit closer? I will belly up to the bar, Your Honor. Thank you. The doctrine of primary jurisdiction has been a fundamental characteristic of railway labor law since the inception of the Act in the 1930s. PCC was admittedly the carrier and the employer. It was also the movement who sought to compel that arbitration, which it could not have done if it were not a carrier under the Railway Labor Act. Judge Bartle below found by interpreting his own order, the consummation order in this case, that PCC was a mere continuation of PCTC, the debtor. This determination is not reviewable de novo. It is reviewable only for an abuse of discretion, and I believe no such abuse has been shown. Under Pitney and also under this court's continental case, which was a labor protection provision case. Doesn't the fact that Judge Fulham said that whatever the outcome be in the Ohio arbitration, that it will be the reorganization court that makes the final determination. So is it not possible then for the reorganization court to say, we absolutely disagree with what happened in the arbitration. We're going to decide it this other way. I think it's very clear from Pitney itself, Your Honor, if you read the dispositive language. The Supreme Court says primary jurisdiction is in the board, and then the case returns to the reorganization court in the words of Pitney, to enforce any rights clearly revealed by the decision. So yes, the case had to return to the reorganization court, because no one anticipated the case would go on for 40 years, and the money was in the reorganization court. Let me ask you, why did the arbitration take so long? It took, for example, I believe between 1980 and 1988 to select arbitrators. Why? I can only point, Your Honor, to the order of Judge Oliver in the Northern District of Ohio, where when in 2005 PCC attempted to derail the arbitrations, he found that they approached the court without clean hands and consolidated all four arbitrations previously they were proceeding separately and ordered them to recommence. Judge Oliver certainly had the discretion at that point to change the order of his own order, the order of that court, to compel arbitration. He did not do so. And the employees, as a result of the arbitration motion that was brought by PCC, were denied the right to jury trial. They lost important legal rights by going forward through the arbitration. Forty years later, it is a tad late to say all of this was a big mistake and that we were litigating a case that was dead since 1978, with no debtor, no defendant, and no money to pay any judgment, all for funsies for 40 years. Did that satisfy you, Your Honor? Well, I mean, it's still, this delay took about 30 years. Was there no one sitting there thinking this has to move forward? Well, I think at all times the employees desired to move the case forward to a conclusion. Railway workers are not wealthy people. They, of course, wanted more than anyone else to get immediate payment of their claims, just like all of their fellows did in the 1970s in the reorganization court. So I don't believe that it is fair to put this at the feet of the railway workers. Is it correct? Yes. Go ahead, Judge Roth. No, go ahead. Go ahead. Is it correct that all the MPA claims were paid in hundred cents dollars? That is correct. And I want to address. So there were no MPA claims that were, for instance, submitted as like a $600 claim and then paid under the plan for, you know, ten cents or a lesser amount? There were no such claims. Indeed, the claims are not classified or even mentioned in the plan. And it is a matter of fact from the record in the arbitration and also from the appeal to the Surface Transportation Board that approximately $88 million of such claims were paid, paid in full during the course of the reorganization proceedings. You would think, you would be hard pressed to think that if the debtor could have somehow compromised those claims and not paid hundred cent dollars, they certainly would have done so. During the case, the debtor sought legal authority to do that by proposing an amendment to the Bankruptcy Act known as Section 77T, never enacted by Congress. That section would have allowed the reorganization court to impair labor protective provisions or merger protection agreement claims. It was never passed by Congress, and I think the debtor is proceeding or arguing today as if it had gotten Congress to enact that law. It is also proceeding as if 77N had never been passed. I want to dispel the notion that if only Judge Fulham had kept jurisdiction of this case, people would have realized that 77N didn't apply. Judge Fulham, in this case, in the Crew Consist litigation, it's cited in our brief, it's the 1972 version of Penn Central, cited Pitney, number one, as divesting him of jurisdiction and requiring that the Crew Consist litigation go to arbitration. Number two, he cited Burke v. Morphy, the case we cited for the proposition that he could not impair the claims. He cited 77N and quoted it in Hike-Verba. He, in addition, said, as a result, and he did ultimately send the Crew Consist case to arbitration, admitting that the jurisdiction, primary jurisdiction, was in the system board. He also said, in his opinion, that some employees who might be affected by that arbitration would have merger protection claims arise and that those claims ought to continue. He wrote that they shall have those protections in his order. Judge Fulham did not believe that there was no recourse for merger protection claims in the bankruptcy. A few years later, in 1976, he was confronted with another 77N claim on behalf of a personal injury claimant named Albert Hawk. Albert Hawk turned out not to be an employee of the company, but Judge Fulham ruled that if he were an employee of the company, his claim would be entitled to immediate payment with interest and would be preferred against other creditors. In the following year, the debtor sought to disaffirm its executory contracts. It presented a motion before the court to that effect where it did not classify the Merger Protection Act or collective bargaining agreements generally either to be affirmed or disaffirmed. It left them in limbo. And Hewlett Skidmore, a railway employee, went to court that day and asked the court, can you impair my claims under rule, under 205N, which is the U.S. Code section for 77N? He said, I don't believe you can. And Judge Fulham said, I agree with you. Words that indicated that Judge Fulham was very well aware of his lack of power, judicial power under 77N to impair those claims. And he ultimately told Mr. Skidmore, this proceeding can't affect your claims. Now, that's not just a snippet. That's a series of decisions and rulings by Judge Fulham which shows he was well aware of the precedents upon which we rely in this case. Does the court have any particular questions for the claimants? No, I don't. I want then, in closing, briefly to address a couple of things raised by Mr. Chaffee. He made the contention that 77N doesn't speak to whether the reorganized company can be held liable. This court has held a couple of times in Schweitzer and Zulkowski that personal injury claims for railroad workers, which happen to also be protected by 77N, are in fact the liability of the reorganized company and that they ride through. He also made Mr. Chaffee, excuse me for the familiarity, Mr. Chaffee also said that this is an interesting question about the intersection of labor policy and bankruptcy policy. It is indeed, and the plenary power for bankruptcy and for commerce resides not in the courts but in the Congress. Congress has told us how they intersect in 77N. The words Congress chose, no judge acting under this title shall change the wages or working conditions of railroad employees except in the manner prescribed in the Railway Labor Act. That is a very clear policy choice by Congress that it is the Railway Labor Act that prevails over bankruptcy law in this one instance. I don't know what words Congress could use otherwise to express its intent. The contention also raised by appellants that the labor claims were addressed head-on by the reorganization court, I think ignores the pre-consistent litigation that I just recited for the court wherein Judge Fulham admitted that he was constrained by 77N and by the Supreme Court's decision in Pitney. And then in closing, Your Honor, I simply want to address the interest question that was raised. It is generally true that where an insolvent debtor cannot pay claims legally because they are stayed, that the interest ceases to run on those claims. That would be basically unsecured. For example, but it is still the law today, as the court well knows, that when claims are not dischargeable and survive the bankruptcy, and there are many examples besides 77N, loans, certain child support payments, claims for breach of fiduciary duty, and many other things under the modern code, interest runs on those. Well, it's a present value concept, is it? Yes. I mean, if everybody's getting $0.01 in the proceeding, and for whatever reason somebody's rights aren't determined for eight years later, you're not going to dilute the fact that they would have been entitled to $0.01. That is correct. And it is one of the factors cited by Judge Bartle. In his opinion, Judge Bartle gave good sound reasons why he thought interest should be awarded to these claimants. First, the payment of the claims never was stayed. The claims aren't dischargeable. PCC was found by this court to be solvent in the 1979 appeal. PCTC was never liquidated. That was found by this court in the 1991 appeal, both of which are cited in brief. He held that it was part of the inherent power of the arbitration board to determine the value of the claims, which included prejudgment interest, a classic remedy, a make-all remedy in labor cases not only under arbitration but also under discrimination statutes. And finally, he held, of course, that it was the intent under 77N not to preclude the running of interest on those claims. I also want to mention in the last moments I have, Your Honor, that another ruling made by Judge Bartle that is covered by the abuse of discretion standard is his determination that the appellants should be stopped from denying that they were the railroad carrier after having litigated under that pretense for more than a quarter century. He found this to be on all fours with this court's decision in the Continental Airlines case where Continental, as a debtor, attempted the same disavowal of its own earlier position. And again, no abuse of discretion has been shown here. Judge Bartle thought the case was on all fours. You have heard nothing from the appellants that indicates that there is a significant difference between this case and Continental other than that Continental is an airline and this is a railroad. Thank you, Your Honor. Thank you very much. Mr. Chaffee, your reserve rebuttal. Yes, Your Honor. First of all, with respect to Continental, Your Honors, it's not applicable because that case did not involve whether a reorganized company loses protection from a court's consummation order because of judicial estoppel. There's not one cited case, either in the claimants' brief or by the district court or anywhere that we could find, that says a reorganized company that's protected by a sweeping broad consummation order can lose that protection through judicial estoppel. As I said a little bit earlier, and I think this really bears repeating, there is no judicial estoppel here on the facts of the case. And if you find that there's some dispute of fact, as you know, this case was decided on summary judgment and the case should be remanded. But as I pointed out to you, if you look at JA-477-478, the debtor, the trustees, on their own behalf and for their successors, i.e., the reorganized company, preserved and protected the protections that they would get from the bankruptcy court. What more could they have done? And the court ordered it through the stipulation. And so there's never been an inconsistent position that the reorganized company has taken. The reorganized company always turned to these stipulations and said, we're protected. In addition, the reorganized company, if you look closely at 6.04, was compelled, mandated, in its own name, to go forward and defend litigation. It's not permissive. The district court committed reversible error by not reading the whole section in its totality. That section clearly mandated the reorganized company to do what it did, and it did it knowing that these stipulations existed. Why did the arbitration take so long? Judge, with all due respect, I was in high school during some of it, and I don't know the answer to that. I think that may be an important fact. There's been no discovery in this case. It went off on summary judgment. To the extent that that bears on interest, and I think it does, given what the district court said, this case should be remanded to discover that question. But there is no evidence in the record, just like Judge Rendell, there's no evidence in the record whether or not MPA claims were paid 100 cents on the dollar. There's nothing there. Well, there are some pages showing payments, but maybe they were post petitions. Why couldn't you in 1978 have come into the district court and sought a declaration of discharge and unenforceability with respect to whatever claims would come out of arbitration? Because I don't think that's the result. The result here is that these claims might very well be able to be prosecuted and collected from what remains of the debtor's estate. If you look closely at how Judge Fulham established the future of the debtor, there are a whole series of securities, notes, et cetera, that were to be held by the reorganized company to pay the claims as they arose post consummation. But these claims weren't provided for in the plan. So why? I strongly disagree. They were provided for in the plan, and that's a key part of our argument. Because the plan – You're saying they're Class D? No, no, no. That's part of it. They are like Class D because that's where these claims arose. But Class D is an administrative claim. I mean, clearly they're administrative claims. But, Your Honor, what I'm saying is that the reorganization included the provisions of the Rail Act, 211H and 504E that provided for the payment of these claims. So what we respectfully suggest you should do in this case is remand it for determination whether those claims could be pursued against the debtor. And if you go back and look at Judge Fulham's original order accepting jurisdiction back from the Northern District, he said the reorganized court would decide three things. Number one, whether the reorganized company was liable. Number two, whether interest could be awarded. And number three, whether the claims could be brought and collected from the debtor. There's no evidence in the record that there aren't assets, either remnants of the 211H program and 504E, or otherwise that could satisfy the claim. All right. Thank you, Counsel. Thank you, Your Honor. Thank you, Counsel. The case, as we'll argue, we'll take it under advisement.